This morning is December 2012, 50-90, Arakama Coal Company against the United States. Mr. Becker. Thank you, Your Honor. May it please the court, my name is Stephen Becker. I'm here on behalf of the consolidated group of coal producers. The theme of my argument this morning is that no point of nexus lies between reclamation efficiency tax and the extracted coal, the extracted raw coal. But every point of nexus lies between the tax and the process coal sold in the export stream. Hence, the tax must be considered imposed on that process coal in the export stream as opposed to being imposed on the extracted coal. Mr. Becker. I'm sorry, I think we both kind of asked the same question. I think so. Is there any distinction between this case and the consolidation coal cases decided by this court previously? There is. That would make a difference in the outcome of this case. There is, Your Honor. The consolidated, the Consolidate 5, which is the previous case in this court immediately prior to this case, which considered specifically the regulations that we're talking about this morning, did not consider the argument that the Liggett case, on which it relied, applied a test for governmental immunity doctrine. In other words, whether or not the tax on the tobacco in the Liggett case imposed a direct burden on the state of Massachusetts. And indeed, You said that the court did not consider the argument. That sounds like another way of saying you think that the court misapplied the Liggett precedent. Well, in this circuit as well as in others, there's no stare decisis effect with regard to decisions that are not actually taken or just left assumed or unannounced. And nowhere in the Consolidate 5 decision was there any address of the argument that the Liggett case and its insistence on finding a sales tax or an ad valorem tax is entirely irrelevant under the Export Clause. The Export Clause doesn't prohibit ad valorem taxes on exports. It prohibits all taxes on exports. And that was not addressed. In addition, there is a very dramatic and new fact that was not disclosed at the time of Consolidate 5. But rather, after the briefs were submitted and unbeknownst to counsel, the OSM submitted a brief in the Wyod Act case. And there, OSM stated its policy that the regulations are applied in all respects to the condition of the coal at sale. And why was it so significant and relevant to this panel's consideration today? And that's because it dealt with an issue that's absolutely germane to whether or not the tax falls on the extracted coal or on the processed coal, which is salt. And that is the rate of tax. There's nothing more essential to the nature and subject of the tax than the rate that's applied. I guess I'm a little unclear on what you're telling us. I think what you said was after the briefs were submitted and Consol 5, they submitted some brief. Well, we have 28J, additional authority. I mean, was there not an opportunity for your side to present that to the court, even if it happened after the briefs were filed? Your Honor, I didn't mean to suggest that we were aware of it at the time. We only became aware of it in this past, I believe, six months. They submitted a brief that said that the rate of tax for lignite at extraction would essentially be ignored when at the time of sale of blended coal that includes lignite as a component. If that blended coal at the time of sale does not constitute lignite because of its BTU level, then there's no lower tax rate that's assigned to any portion of the processed coal at sold. So what that means in essence is that the tax that OSM claims to be imposing at the time of extraction, which should differentiate between lignite at an $0.08 per ton rate and bituminous coal, which can be as high as $0.28 per ton, that all goes by the wayside. So it's really just illusory that the subject of this tax is extracted coal or raw coal, rather the subject of the tax depends entirely on the status and the rank or quality of the coal at the time of sale. It's a processed product. Let me just be clear on what you're asking. Is your argument, so you've made two points here, one on lignite, that it was not appropriately considered by the prior panel and the other about this additional brief, is it your view that those two matters permit this court as a panel to go away other than our court has previously done? Yes, Your Honor. I thought your brief was arguing that we should convene en banc to overrule the panel decision. Absolutely. Although we do request en banc review, it's the producer's position very clearly based on the law of the circuit that what is not announced and what was not actually addressed and decided by the previous panel does not have stare decisis effect on a subsequent panel. Let me test that proposition. We have frequently cases in which counsel make numerous arguments. We sometimes complain about the fact that counsel make too many arguments. Sometimes our opinions do not address all the arguments made by counsel. Is it your submission that an opinion that addresses fewer than all of the arguments made by counsel thereby does not constitute a ruling on the arguments which have not been accepted, but have not been specifically adverted to in the opinion? Your Honor, I'm not prepared to address the very limits of the test, but here, the essence of the application of the export clause was not addressed. There was simply an acceptance of the absence of the sales tax as an indication that by default, this must be a manufacturing tax and there was no address at all given to the fact that the export clause concerns itself not with the sales, not with running up to the sales tax. It doesn't quite fit, does it? This is a reclamation tax, not a sales tax. And so for us to review and put in motion some sort of set, you need to persuade us that it was wrongly decided. And I do have trouble figuring out now going to the merits. When you have a reclamation tax, the circumstances of reclamation are the same, whether the coal is hard or soft, whether it's exported or not. I know you don't discuss this particularly in your brief and I can understand why, but you do need to persuade us that it was wrongly decided. Yes, Your Honor, I'm about to do that right now. The raw product consists of rock and dirt and irregular shapes of combustible coal, differing sulfur, moisture, and other characteristics, and the processing converts it into a product that can actually be bought by steel mills and by power plants. The raw coal is not purchased by end users. It can't be used by them. So the processing is very significant in its substance and its value, but also in the fact that it converts the raw coal into a different product. And that's done whether or not it's exported. Absolutely. Absolutely. And the significance of that is that under the Richfield oil case, and others like it, and under Fairbank, Richfield oil requires that the And here, when all the points of nexus between the tax and the product lie with the processed product that's being sold and not with the extracted coal, there isn't anything in the record, nor has the government pointed to any point of nexus between the tax and the extracted raw coal. Then the result has to be that the operation and effect of this tax is to on the coal wallets and the export stream. Let me see if I, let me return to the Liggett question again. You argued the previous consolidation coal case, I think, in which Liggett was discussed by the court. You made an argument with respect to Liggett. How does your argument today differ from the argument you made with respect to the inapplicability of Liggett to the question before the court? How does that argument that you made then differ from the argument you're making now? Well, two points, Your Honor. I recall that what we argued was that the export clause was a more stringent test, but the sales tax aspect, I don't believe was addressed specifically. In other words, the requirement that Liggett imposed in a governmental immunity doctrine context of a sales tax, as opposed to any other tax, I don't recall being addressed, nor was it obviously addressed in the consolidified opinion, rather it might just be assumed that the requirement of a sales tax is one that has to be met if an export clause violation would be found. But of course, if that's the case, then that would excise from the scope of any consideration under the export clause and remove from its protection any tax that is not a sales tax. So the Black-Long excise tax, for instance, which was declared unconstitutional, that's a tax just like this one on tonnage. And so should all taxes under the export clause that are not ad valorem taxes be considered somehow immune? Is that the way we'd like the government to approach taxation of exports, that all it has to do is craft it in such a way that it's based on a physical unit of volume or quantity and just avoid a sales tax? That couldn't possibly be the test under the export clause. The export clause imposes a sweeping burden on any tax whatsoever. It says nothing about sales tax or ad valorem tax. It's totally unqualified. Okay. Let's save you a rebuttal time, Mr. Becker. Let's hear from the government. Ms. Hogan. Good morning, Your Honors. May it please the Court. The judgments of the trial court, which correctly followed this court's prior to consolidation coal decisions, were correct and they should be affirmed. I first want to note that 66 of the current appellants were also plaintiffs in the consolidation coal case. And as we noted in our brief, they are collaterally stopped from re-arguing that this is the arguments that were raised in consolidation coal. But the remaining appellants have also not demonstrated that there is any new consolidation coal decision. That's not the question. The basic question is, is that prior decision correct? Well, the question is, really, is this an appropriate case to be referred for en banc consideration? Does it present an exceptional question of importance, or is it inconsistent with either Supreme Court precedent or this court's precedent? No, it's appropriate if we got it wrong. If the court got it wrong, then yes. But again, the court is obligated to follow even wrong prior precedent, unless and until the full court... I'm not sure I understand you. You're telling us that we are obliged to preserve an incorrect decision if, in fact, it's incorrect? No, to be clear, I'm not suggesting that. But this court is bound to follow prior precedent unless and until the full court overturns that precedent. Now, this panel might decide... Yes, and the petitioner has so requested. He has presented that question to us, never mind whether it does or doesn't have merit. I'm not sure I hear you saying that there's no way that this court can review the possibility of having gotten it wrong. Certainly, that's what's before the court. And our position and what we've argued in the brief is that there's nothing new about this case that will call into question the prior decision, or anything wrong about the court's prior decision. The two arguments that... Well, you're not answering my question. You're saying leave it alone. I'm suggesting that there's no reason to reopen consolidation court because the prior court got it correct. And the two arguments that the appellants have made here rely upon a perceived misapplication of the Liggett decision and what would appear to be a sentence in a brief filed in the Tenth Circuit are not reasons to call into question the correctness of this court's prior two decisions. The Liggett decision was first very well argued by both sides in the consolidation court decision. And I think had the court done what the appellant contends that the tax immunity clause analysis to the export clause analysis, that probably would be incorrect. But that's not what this court did. What this court did was rely upon Liggett simply for the proposition that what is otherwise a deferred collection of payments does not convert a manufacturing fee into a sales fee and applied that principle, which is a principle that this court has also applied in the export clause situation in New Farm to say that a fee upon extraction, which is constitutional under the export clause, is not converted into a sales tax merely by the delayed collection of fee, which is done for the benefit and the convenience of the coal industry. That's not incorrect, and that was appropriate for this court to consider that What about the Tenth Circuit brief? What's the name of the case? Your Honor, the name of the case is Wiodak, and just to be upfront about that case, it was dismissed by the Tenth Circuit for lack of jurisdiction, refiled in the Court of Federal Claims, and that case is now currently being briefed before this court. So it's not a final decision in any sense of the word. But I think what the appellants are getting at is a statement that was made in the brief by the government regarding when the imposition of the fee was, and I certainly would agree that it was probably inartfully worded. But the issue in Wiodak was not an export clause case. It was a question of whether the value of the coal, whether it's a lignite or bituminous coal, could be determined prior to extraction or at some later time. The plaintiffs in that case are arguing that you can look at the coal as it's still in the ground and make a determination about what kind of coal it is, and OSM's position in that case is that that's not appropriate. That really doesn't get to the question presented in this case because everybody agrees that coal extracted is constitutional. So we're not talking about what happens somewhere between extraction and sale, which could theoretically be somewhere in the export stream of commerce, but that doesn't call into question this court's decision which says that the statutory term coal extracted, which is what the fee is imposed upon, is a constitutional reading of the statute, one that doesn't call into question the export clause. So we really don't think that Wiodak, first of all, is not a decision by a court on this issue that might call into question this court's prior decision. It was merely a statement made in the brief, and it certainly does not undermine what has been OSM's otherwise entirely consistent position throughout this last decade, that the fee is imposed at the time of extraction, and it's merely OSM's administration's collection of that fee at the time of first transfer, sale, or use. It's just an administrative procedure. It does not affect the quality or the essence of the fee, which, again, I can't underscore enough, is imposed by Congress and not by the Department of the Interior. Just out of curiosity, was that brief, the Tenth Circuit brief, submitted on behalf of OSM, but was it submitted by the Civil Division or by the U.S. Attorney's Office? I believe it was the Appellate Division. The Appellate Staff, I guess they call it, of the Civil Division, but not by Commercial. Correct. Yeah. Sometimes there's not very much confrontation between the two. Okay. That's fine. The other arguments that, just briefly to address the other arguments that were raised in the brief, the Appellant's Office challenged the child court's refusal to stay the cases pending a newly filed district court proceeding. They didn't address that argument in their reply brief, so I don't know if that's a concession, but we'll rely upon our brief to demonstrate why that was a correct decision. And unless the Court has any further questions, we believe that the consolidation whole decisions were correctly decided, were correctly followed by the child court, and these cases should be affirmed by this Court. Any questions? Okay. Thank you, Ms. Hogan. Mr. Baker. If you please, I'd like to address quickly WIADAC. It's of no moment that that case ended up being transferred to this Court. The significance of WIADAC, and it's indicated in the WIADAC decision, is the position taken by OSM regarding the application of its regulations. And that issue does not go to the value, as counsel indicated, of the difference in value between extracted coal and the processed coal itself, but rather the very rank or quality or identity of the coal. If the government's position is that the regulations indeed impose a tax at the time of extraction, Congress prescribed a lower rate of tax for lignite. Does that just disappear when it becomes blended into the processed product at the time of sale? Indeed, it should not if the government's position should be maintained. Rather, if this is merely a deferred tax, as the government claims, then whatever portion of the processed product consists of lignite extracted from the ground, that tax at the rate should be deferred and should enter into the calculation at the time that the processed product is sold. But if that's not what happens. It's a matter of statutory interpretation. How do you overcome the undisputed fact that the remediation is required whatever is done with the coal, whether it's exploited or not? Your Honor, I fully disagree that remediation is required. The issue before this panel, however, is whether or not the tax violates the export clause because it's imposed on the product, on the processed product and the export stream. How the government wants to fashion a tax that does not violate the Constitution is not a matter before this court. The only issue is whether or not this particular tax violates the export clause. Based on all the points of nexus, and this honorable panel has not heard the government point to any point of nexus between the tax and the extracted coal, other than by name. And we know from the Fairbank case that the form of the tax does not vary the substance. And from Richfield, that you have to look at the operation in effect. And in terms of the importance of the issues in this case and why they warrant, if this panel feels unable to decide the matter itself in favor of the producers, then on-bank review is warranted because if the position of the Consolidate Five panel is less undisturbed, it opens up a wide gap in the coverage of the export clause. As I said in my main presentation, all the government has to do is to impose a tax that is on tonnage or on some physical value as opposed to a function of the sales price. And they've circumvented the protection of the export clause, which is so essential to the parties coming together, the framers of the Constitution reaching an agreement. No burden of taxation at all would be tolerated. And that means that this is of utmost importance. And in addition, the panel's invocation of the Constitutional Avoidance Doctrine, the way it did, was precisely the opposite of what the Supreme Court in the DiBartolo case said should be done. The court is not permitted to merely presume the constitutionality of a statute or a regulation. Rather, it should look at what the, if there's more than one reasonable interpretation of the statute, then as the Consolidate III panel did, it would find that that would be the interpretation of, for instance, coal produced. But then the next step is not merely to presume the constitutionality of the regulations, but rather to examine whether the regulations indeed impose the tax on extraction. We've demonstrated that it does not. Okay, thank you, Ms. Becker. Thank you, Ms. Hogan. The case is taken under submission.